UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BOWHEAD OPERATIONS &
MAINTENANCE SOLUTIONS LLC,

               Plaintiff,

     v.

ENDURANCE AMERICAN
INSURANCE CO, *et al.*,

             Defendants.

CASE NO. 2:21-cv-00909-JCC-JRC

REPORT AND RECOMMENDATION

NOTED FOR: May 6, 2022

This matter is before the Court on referral from the District Court (Dkt. 5) and on the parties' cross-motions for partial summary judgment.[1]  Dkts. 28, 41.

In July 2020, "Multipurpose Craft 4" ("MPC-4"), a 97-foot Navy vessel operated by plaintiff's employee, ran aground on submerged rocks off the coast of Hawaii.  Plaintiff was operating the MPC-4 as part of a 2018 contract with the Navy to retrieve torpedoes from an

---

[1] The parties request oral argument, but because oral argument is not necessary to resolve the issues raised herein, the Court declines to grant the request before issuing this Report and Recommendation.

REPORT AND RECOMMENDATION - 1

underwater firing range.  After allegedly paying about $6.7 million to repair the vessel, plaintiff sought coverage from its insurers.  Plaintiff brings this action against four insurance companies and alleges that defendant Endurance American Insurance Company, the lead underwriter, refused to cover the damages.  The parties' partial cross-summary judgment motions seek a determination of whether the damages are covered under the relevant insurance contracts.

The parties present three primary questions for the Court to resolve:  (1) what law applies to the interpretation of the insurance policies, (2) was plaintiff a "charterer" of the MPC-4 so that an endorsement covering chartering applied, and (3) did policy language apply that effectively expanded coverage where plaintiff assumed liability under a contract?  Resolution of these motions turns on the first and second questions.  Alaskan law applies here, and under Alaskan law, extrinsic evidence that the parties intended for the "charterer" endorsement to apply to operation of the MPC-4 creates genuine issues of material fact and makes interpretation of the "charterer" exclusion in the policy an issue of fact for a jury to decide.  Regarding the third question, the Court agrees with defendants that, as a matter of law, the assumption of liability language in the policy was not triggered because plaintiff did not "assume" additional liability when it agreed to be liable for damage to the Navy property under the Navy contract.

Even though the Court agrees with defendants related to the third question, because there are genuine issues of material fact related to the charterer endorsement, the Court does not recommend granting either summary judgment motion.  The District Court should deny plaintiff's motion (Dkt. 28) and grant in part and deny in part defendants' motion (Dkt. 41).  To the extent that plaintiff rests its claims on allegations of coverage under the primary policy's "liability assumed by the assured under any contract or agreement except an incidental contract. . . ."  language, such claims should be dismissed.

## BACKGROUND

The following facts are undisputed for purposes of summary judgment, except as noted.

### I. The Relevant Policy Terms and the Navy Contract

At the time of the grounding, plaintiff was performing its obligations under the Navy contract, a "non-personal services contract to provide for the operation of multiple Vessels and related maintenance services, port operations, and waterfront administration in support of Naval Submarine Support Command . . . at Joint Base Pearl Harbor-Hickam . . . [in] Hawaii." Dkt. 31-4, at 3. The Navy paid plaintiff to perform services including using the MPC-4 and other Navy "torpedo retrieval Vessels" to recover exercise torpedoes. Dkt. 31-4, at 3, 8; *see also* Dkt. 21-1, at 2.

The Navy Contract provided that plaintiff would take custody of "Government furnished Vessels" after the Navy and plaintiff jointly inspected the vessels and that plaintiff would be responsible for the vessels' operation and maintenance. Dkt. 31-4, at 4–5, 7. Plaintiff's own "craftmasters" were responsible for navigating and maintaining the vessels. *See* Dkt. 31-4, at 6. The Navy contract also incorporated a variety of clauses by reference, including 48 C.F.R. § 252.247-7007, which provides that a contractor "shall be . . . [l]iable to the Government for loss or damage to property, real and personal, owned by the Government or for which the Government is liable[.]" Dkt. 31-4, at 10; 48 C.F.R. § 252.247-7007(a)(1).[2]

Plaintiff carried two "Ocean Marine Insurance" policies at the time of the grounding: the primary policy, which provided "Comprehensive Marine Liability" insurance effective from March 2020 to March 2021 (Dkt. 23-1, at 11), and an excess policy, called a "Marine

---

[2] This regulation has since been amended, but the Court cites the current version, as the amendments did not affect the relevant language.

1    Bumbershoot" policy, providing additional coverage for the same time period. Dkt. 31-2, at 3.

2    The parties agree that whether the primary policy covered the damages to the vessel is

3    dispositive for purposes of their summary judgment motions. *See* Dkt. 28, at 9 ("[I]f a loss falls

4    within the primary policy's insuring agreements, it also falls within the excess policy's."); Dkt.

5    41, at 7 (similar).

6        The named assured on the primary and excess policies was UIC Marine Services, LLC,

7    with its address listed in Alaska, although various endorsements also listed plaintiff (and other

8    entities) as named assureds. *See* Dkt. 23-1, at 2, 8, 54; Dkt. 23-3, at 2. According to

9    Endurance's evidence, a related company, UIC Government Services, LLC, is the holding

10   company for plaintiff and other similar companies, and UIC Government Services, LLC, is itself

11   affiliated with parent company Ukpeagvik Iñupiat Corporation ("UIC"), an Alaska Native

12   Corporation. *See* Dkt. 22-1, at 2–3; *see also* Dkt. 31, at 1 (stating that UIC wholly owns

13   plaintiff). Endurance and defendant U.S. Specialty Insurance Company were also listed on the

14   primary policy, splitting participation. *See* Dkt. 23-1, at 4, 9. The excess policy listed all four

15   defendant insurers sued in this matter (Dkt. 31-2, at 5) but stated that these underwriters would

16   "follow [Endurance] regarding . . . any claims hereunder[.]" Dkt. 31-2, at 8.

17       The primary policy covered property damages that plaintiff became legally obligated to

18   pay, up to $1 million per occurrence, with the following exclusions relevant to this matter. Dkt.

19   23-1, at 15.

20       First, the primary policy generally excludes property damage that arises out of the

21   "operation" of "any watercraft owned or operated by or rented or loaned to any assured[.]" Dkt.

22   23-1, at 15. The Court refers to this as the "watercraft exclusion."

23

24

1    Second, the policy excludes "liability assumed by the assured under any contract or

2    agreement except an incidental contract. . . ." Dkt. 23-1, at 15.  Although the term "incidental

3    contract" is narrowly defined in the primary policy (Dkt. 23-1, at 13), a "Broad Form Liability

4    Endorsement" includes "Contractual Liability Coverage" that dramatically broadens the term

5    "incidental contract" to include "any oral or written contract or agreement relating to the conduct

6    of the Named Assured's business." Dkt. 23-1, at 39.  This endorsement also eliminates the

7    "watercraft exclusion" as applying to the Contractual Liability Coverage.  Dkt. 23-1, at 39.

8    Thus, it is plaintiff's position that the primary policy broadly covers "liability assumed by"

9    plaintiff under "any oral or written contract" related to the conduct of plaintiff's business. *See*

10    *generally* Dkt. 28.  Plaintiff points to the Navy contract's incorporation of § 252.247-7007(a)(1)

11    (allegedly making contractors liable to the Navy for damaging Navy property) as an example of

12    "liability assumed by" plaintiff under such an incidental contract. *See generally* Dkt. 28.

13    Finally, the policy contains an endorsement for chartering.  The "Charterer's Legal

14    Liability Endorsement" states that plaintiff will be indemnified for "all sums which [plaintiff] as

15    charterer of vessels hereinafter described shall become obligated to pay. . . ." Dkt. 23-1, at 57.

16    This endorsement excludes coverage for any "bareboat or demise charter[.]" Dkt. 23-1, at 57.

17    Plaintiff alternatively argues that plaintiff was chartering the MPC-4 at the time of the

18    grounding, so that the policy must cover the damages.  Dkt. 28, at 17.

19    **II.  Plaintiff's Claim**

20    The Navy authorized plaintiff to repair the MPC-4 (Dkt. 31-6, at 2), and plaintiff

21    contends that it incurred costs of approximately $6.7 million.  Dkt. 31, at 3.  On August 4, 2020,

22    plaintiff's parent company, UIC, filed a notice of claim.  Dkt. 23-2, at 2.

23

24

1    According to plaintiff, the insurers investigated the claim and matters "proceeded for

2    months without acrimony." Dkt. 32, at 2. Indeed, plaintiff provides evidence that Endurance's

3    claim representative wrote in an email that the claim representative thought that the damages

4    would be covered. *See* Dkt. 32-1, at 2.

5    On January 19, 2021, however, Endurance advised UIC that Endurance was "unable to

6    find coverage for this incident" and asked why UIC believed the matter should be covered. Dkt.

7    23-4, at 2. Endurance stated that the matter was not a "final coverage response." Dkt. 23-4, at 3.

8    It advised UIC that the policy was "a liability policy and does not provide first party Hull

9    insurance for the Navy vessel" and that Endurance was acting "[p]ending receipt of a final claim

10   from the Navy," who had to "deal with the damage to the vessel and repairs and mitigate its

11   loss." Dkt. 23-4, at 6.

12   Plaintiff also provides a letter that Endurance sent in April 2021, requesting UIC's

13   "views on coverage" and stating that if no response was received within 30 days, Endurance

14   would decline the claim. Dkt. 31-8, at 2. For its part, Endurance provides a letter from plaintiff

15   on May 20, 2021, giving notice that if Endurance did not acknowledge coverage within 20 days,

16   plaintiff would "amend the complaint it has filed to assert an Insurance Fair Conduct Act cause

17   of action[.]" Dkt. 23-5, at 8. Endurance responded by stating that the January 2021 letter had

18   not been a final coverage response and by soliciting further information about why plaintiff

19   believed that the loss was covered. *See* Dkt. 23-6, at 3, 7.

20   At this time, plaintiff had already brought suit in state court. *See* Dkt. 2-1. In the

21   operative complaint, plaintiff asserts claims for breach of contract, bad faith, violations of

22   Washington's Consumer Protection Act and Insurance Fair Conduct Act, and seeks reformation

23   of the primary policy, declaratory relief, damages, interest, fees, and costs. *See* Dkt. 1-2, at 13.

24

Defendants' answer asserts a counterclaim for declaratory relief, seeking a judgment that the loss is not covered or that plaintiff has not provided sufficient information to determine that the loss is covered. *See* Dkt. 16, at 23. Defendants removed the matter to federal court, and their partial cross-summary judgment motions are now ripe for decision.

## DISCUSSION

### I. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ruling on a summary judgment motion, the Court must take the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Conclusory allegations and mere speculation are not enough to create a genuine issue of material fact. *See, e.g.*, *Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Finally, the Court may not engage in credibility determinations or weighing of the evidence when ruling on a summary judgment motion. *See Anderson*, 477 U.S. at 255.

### II. Applicable Law of Contract Interpretation

The Court begins by addressing the parties' dispute over which law to apply to this matter. Defendants argue that because this matter concerns maritime insurance, the Court applies federal maritime choice of law principles, supplemented by Alaskan law as necessary. *See* Dkt. 41, at 7–9. Plaintiff asserts that the Court need not wade into a choice of law analysis because coverage exists no matter which law applies, but plaintiff alternatively advocates for application of Washington law. *See* Dkt. 28, at 16. For the reasons discussed below, the Court will apply Alaskan law to this dispute.

1

### A.  State, not Federal, Law Applies

In the context of marine insurance policies, state substantive law applies in the absence of an established federal maritime rule, federal statute, or a need for uniformity in admiralty practice.  *Certain Underwriters at Lloyds, London v. Inlet Fisheries Inc.*, 518 F.3d 645, 649–50 (9th Cir. 2008) (applying *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310 (1955)).  "Since Congress has not taken over regulation of marine insurance contracts . . . there is no possible question here of conflict between a state law and any federal statute."  *Wilburn Boat Co.*, 348 U.S. at 314.

The Court turns to whether "federal admiralty law contains an established, applicable rule."  *Certain Underwriters at Lloyds, London*, 518 F.3d at 650.  Absent special circumstances that are not present in this matter, other courts in this Circuit have generally concluded that there is no judicially fashioned admiralty rule that prevents application of state law regarding contract interpretation.  *See, e.g.*, *Kalmbach, Inc. v. Ins. Co. of State of Pa.*, 529 F.2d 552, 554 (9th Cir. 1976) (finding no judicially established federal admiralty rule regarding interpretation of a marine insurance policy); *U.S. Fire Ins. Co. v. Icicle Seafoods, Inc.*, No. C20-00401-RSM, 2021 WL 5415306, at *3, *6 (W.D. Wash. Nov. 19, 2021) (analyzing a choice of law provision but also noting that state law should be applied to interpret a marine insurance policy).

Defendants argue that there is an established admiralty rule that maritime terms of art must be given their specialized meaning.  Dkt. 41, at 18 & n.20.  This argument is relevant to the discussion of the policy endorsement related to chartering, below, so that the Court briefly addresses it.  The Court is not convinced by defendants' citation to cases setting forth specialized meanings for "owner," "compulsory removal," and "peril of the sea."  *See* Dkt. 41, at 18 n.20.  These cases pertain to the specific terms at issue in those cases.  Defendant has not cited, and the

Court has not found, any particular federal case law expressing a specialized maritime meaning

for the term "charterer."  Absent cases showing that there is an established federal rule that there

is a specialized maritime meaning for "charterer," the Court will apply state law contract

interpretation principles.  *See, e.g.*, *Lincoln Adventures, L.L.C. v. Certain Underwriters at Lloyds*

*of London*, No. 05-60554-CIV, 2005 WL 8156843, at *2 (S.D. Fla. Dec. 30, 2005) (citing

*Wilburn* and applying Florida principles of contract interpretation to construe a maritime

insurance contract including, specifically, the principle that "courts may decline to apply the

plain language meaning of contract terms where the terms take on a different meaning in a

particular trade or industry."); *see also Great Lakes Reinsurance (UK) PLC v. Fortelni*, 33 F.

Supp. 3d 204, 208 (E.D.N.Y. 2014) (applying New York law to maritime contract interpretation

including citing—ultimately—New York law that ambiguity in contract terms exists where a

person aware of a trade or business's particular terminology would find a contract term had more

than one meaning).

Finally, this Court finds it improper to fashion a rule in the absence of any federal statute

or judicially created rule for maritime insurance policies.  *See Wilburn Boat Co.*, 348 U.S. at 316

("The whole judicial and legislative history of insurance regulation in the United States warns us

against the judicial creation of admiralty rules to govern marine policy terms and warranties.

The control of all types of insurance companies and contracts has been primarily a state

function. . . .").

The Court also briefly notes that plaintiff advocates for the application of Washington—

rather than federal—choice of law principles because this case was removed under the Court's

diversity jurisdiction.  *See* Dkt. 28, at 16.  Although in a diversity action, the Court would

typically apply the forum state's conflict of law analysis, where, as here, a case could also arise

1    under the Court's original jurisdiction over admiralty matters, the Court will apply federal choice

2    of law principles. *Accord Galilea, LLC v. AGCS Marine Ins. Co.*, No. CV 15-84-BLG-SPW,

3    2016 WL 754221, at *3 (D. Mont. Feb. 24, 2016) ("If the suit justifies the exercise of admiralty

4    jurisdiction, 'the choice of substantive law to be applied in this case is governed by federal

5    maritime choice-of-law rules.'" (Internal citations omitted.)), *aff'd,* 879 F.3d 1052 (9th Cir.

6    2018); *see also Ghotra by Ghotra v. Bandila Shipping, Inc.*, 113 F.3d 1050, 1055 (9th Cir. 1997).

7                    **B.  Alaskan Law Applies Where There Is A Conflict**

8           Having determined that state law applies, the Court turns to the choice of law analysis.

9    *See* 2 Admiralty & Mar. Law § 19:9 (6th ed.) ("[I]f a court concludes that state law applies, a

10   further choice-of-law analysis frequently is necessary to determine *which* state law to apply.").

11          As plaintiff points out, the Court need not navigate a choice of law analysis if the

12   outcome would be the same regardless of which state's law applies.  However, relevant to the

13   pending motions, Alaskan and Washington law conflict in a key aspect.  Alaskan law treats

14   extrinsic evidence differently from Washington law when interpreting an unambiguous contract.

15   *Compare Whittier Props., Inc. v. Alaska Nat. Ins. Co.*, 185 P.3d 84, 91 (Alaska 2008) (holding

16   that Alaska uses extrinsic evidence to interpret even unambiguous insurance policies because "an

17   insurance policy is an adhesion contract"), *with Ayala v. Cont'l Servs.*, 146 Wash. App. 1046,

18   2008 WL 4069456, at *2–*3 (2008) (concluding that an agreement was an adhesion contract but

19   not automatically allowing extrinsic evidence).

20          Where, as here, the parties have not specified a choice of law in the policy, courts in this

21   circuit look to the state with "the most significant relationship to the transaction and the parties"

22   by considering—

23              (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place
                of performance, (d) the location of the subject matter of the contract, and (e) the

24

1    domicile, residence, nationality, place of incorporation and place of business of the

2    parties.

3    *Aqua-Marine Constructors, Inc.*, 110 F.3d at 674.  These contacts should be evaluated

4    "according to their relative importance with respect to the particular issue."  Restatement

5    (Second) of Conflict of Laws § 188(2) (1971).

6         The Court focuses on the last factor from *Aqua-Marine Constructors*, first.  Here,

7    relevant to the issue of coverage for plaintiff grounding the MPC-4, Endurance and

8    Specialty, who are Delaware and Texas companies with principal places of business in

9    New York and Texas (*see* Dkt. 1-2, at 1–2), subscribed to the policy issued to named

10    assured UIC Marine Services, LLC, which is listed by an Alaska address.  *See* Dkt. 23-1,

11    at 8.  The policy also later named plaintiff, an Alaskan company operating with its

12    principal place of business in Virginia.  Dkt. 1-2, at 1.  As no party advocates for the

13    application of Delaware, Texas, New York, or Virginia law, the final *Aqua-Marine*

14    *Constructors* factor clearly weighs in favor of Alaska.  There is no evidence that any

15    party to the primary policy was located in Washington, as relevant to this particular issue.

16    *See* Restatement (Second) of Conflict of Laws § 188(2) (1971).

17         The place of performance—the third *Aqua-Marine Constructors* factor—is also a

18    relevant consideration here.  The place of performance is generally the insured's location.

19    *See Evers v. Purse Seine Vessel Owners Ass'n*, No. C09-791RSM, 2010 WL 276233, at

20    *4 (W.D. Wash. Jan. 20, 2010).  Plaintiff has not pointed to any evidence or made any

21    argument tending to contradict defendants' assertion that the Alaskan address of the

22    named assured (here, UIC Marine Services, LLC) is the relevant consideration for this

23

24

1    issue.  Indeed, there is no evidence that plaintiff, the parent UIC company, or the named

2    assured are incorporated in or have principal places of business in Washington.

3           Thus the third and fifth *Aqua-Marine Constructors* factors weigh in favor of

4    applying Alaskan law.  The Court turns to the remaining factors, which are of lesser

5    importance here.

6           The subject matter of this policy bears little weight, as, relevant to this particular

7    issue, this factor would weigh in favor of Hawaii, where the grounding and repairs

8    occurred—but no party advocates for the application of Hawaiian law.  Moreover, the

9    Court agrees with defendants that it makes sense to apply Alaska law to the primary

10   policy to avoid inconsistent results depending on the location of an incident.  *See* Dkt. 41,

11   at 14.

12          The places of contracting and negotiating are also neutral factors in this matter.

13   The place of contracting is "the place where occurred the last act necessary . . . to give

14   the contract binding effect[.]"  *Ingenco Holdings, LLC v. Ace Am. Ins. Co.*, 921 F.3d 803,

15   810 (9th Cir. 2019) (internal quotation marks and citations omitted).  According to

16   defendants, Endurance executed the primary policy in New York (Dkt. 23, at 2), although

17   it is unclear whether this was the last act necessary for the policy to be binding, so that

18   this factor does not strongly weigh in favor of any particular state.  As for the place of

19   negotiations, although plaintiffs have come forward with evidence that historically

20   negotiations occurred in Washington, it is undisputed for purposes of summary judgment

21   that the negotiations for the 2020/2021 renewal occurred virtually, due to the COVID-19

22   pandemic.  *See* Dkt. 30, at 2–3 (plaintiff's evidence discussing email negotiations

23   between Seattle-based broker and Seattle-based underwriters); Dkt. 31, at 3–4 (indicating

24

1  that UIC representative based in Virginia did not fly to Washington for 2020/2021

2  renewal).  Thus this factor is of minimal importance.  *See* Restatement (Second) of

3  Conflict of Laws § 188 (1971) ("This contact is of less importance when there is no one

4  single place of negotiation and agreement, as, for example, when the parties do not meet

5  but rather conduct their negotiations from separate states by mail or telephone.").  Even if

6  the negotiations did occur entirely between Washington-based agents of the parties, the

7  Court would not be convinced that Washington's interest overcame the interests of

8  Alaska in this matter.  *Cf. Certain Underwriters at Lloyds, London v. Inlet Fisheries, Inc.*,

9  370 F. Supp. 2d 974, 977 (D. Alaska 2004) ("However, Washington's interest is diluted

10  by the fact that neither of the parties to the insurance contract are incorporated, domiciled

11  or maintain a principal place of business there. . . .").

12      Thus, the Court will apply Alaska's rule regarding extrinsic evidence when resolving the

13  issue of coverage under the charterer endorsement.  The Court turns to this issue.

14  ### III.  Coverage when Plaintiff Is a "Charterer"

15      The primary policy contains a "charterer's legal liability endorsement" stating that

16  Endurance will indemnify plaintiff for "sums which [plaintiff] as charterer of vessels hereinafter

17  described shall become obligated to pay. . . ."  Dkt. 23-1, at 57 (formatting removed).  The

18  endorsement also expressly excludes liability "[a]rising from a bareboat or demise charter of any

19  vessel[.]"  Dkt. 23-1, at 57.  The parties disagree over whether plaintiff operated the MPC-4 as a

20  "charterer."  Dkt. 41, at 18.  The Court finds that genuine issues of material fact preclude

21  judgment for either party on this issue.

22      Alaska has adopted the doctrine of reasonable expectations.  We have held
       that "[t]he obligations of insurers are generally determined by the terms of their

23     policies."  But because insurance policies are contracts of adhesion, they are
       construed according to the principle of "reasonable expectations."  Under the

24

reasonable expectations doctrine, "[t]he objectively reasonable expectations of applicants . . . regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations."

It is a settled principle that ambiguities in an insurance policy are construed in favor of the insured. The court need not find the policy ambiguous, however, to construe it under the reasonable expectations doctrine. To determine the parties' reasonable expectations, the court examines (1) the language of the disputed policy provisions; (2) the language of other provisions in the same policy; (3) extrinsic evidence; and (4) case law interpreting similar provisions.

*West v. Umialik Ins. Co.*, 8 P.3d 1135, 1138 (Alaska 2000) (footnotes omitted).

Under Alaskan law, "[c]onstruction of an insurance policy under the principle of reasonable expectations does not depend on a prior determination of policy ambiguity." *C.P. ex rel. M.L.*, 996 P.2d at 1222; *see also Norville*, 84 P.3d at 1004 ("Interpretation of a contract is ordinarily a question of law. But interpretation 'becomes a task for the trier of fact when the parties present extrinsic evidence to clarify a contract's meaning, when this evidence points towards conflicting interpretations of the contract, and when the contract itself is reasonably susceptible of either meaning.'" (Internal citation omitted.)). *But see C.P. ex rel. M.L.*, 996 P.2d at 1222 ("[W]here a clause in an insurance policy is ambiguous in the sense that it is reasonably susceptible to more than one interpretation, we accept the interpretation that most favors the insured.").

Here, the parties have presented conflicting extrinsic evidence regarding the reasonable expectations of plaintiff. The policy does not define "charter" or "charterer," relevant to the endorsement. Plaintiff points to an email from Endurance's claims adjuster (Dkt. 32, at 2) stating that the adjuster himself believed that the parties had intended for the Navy Contract to be covered. *See* Dkt. 32-1, at 2 (explaining that the adjuster "ha[d] this one as a charters [sic] liability claim" because it was the "intent of the policy to cover the assured[']s uses of the navy's

1  vessel(s) as if under a charter agreement."). This evidence, viewed in the light most favorable to

2  plaintiff, indicates that the parties intended for the MPC-4's use to be covered when they

3  executed the policy. And as noted above, Alaskan law usually treats insurance contracts as

4  contracts of adhesion[3] and allows the use of extrinsic evidence to understand *even unambiguous*

5  terms in a contract. *West*, 8 P.3d at 1138 (footnotes omitted).

6       For their part, defendants provide evidence that UIC did not disclose that plaintiff was

7  chartering vessels when the parties negotiated the policy. *See* Dkt. 22-1, at 2. They rely on a

8  "description of operations" (formatting removed) that they appear to assert was provided by UIC

9  during policy negotiation. *See* Dkt. 22-1. Viewed in the light most favorable to defendants, this

10  evidence supports their argument that the parties never intended for the MPC-4's operations to

11  be covered under the charterer endorsement.

12       Because of this conflicting extrinsic evidence, in light of the lack of definition of

13  "charterer," and applying Alaskan law, interpretation of the primary policy's charterer

14  endorsement is for the trier of fact. On this record, the Court cannot resolve the issue as a matter

15  of law.

16       Defendants argue that even if the use of the MPC-4 was a "charter," it would be a

17  "bareboat charter," which is excluded from coverage. *See* Dkt. 23-1, at 57. However, viewing

18  plaintiff's evidence in the light most favorable to it also raises an inference that the parties did

19  not intend for the bareboat charter to apply to the operation of the MPC-4. Moreover, a bareboat

20  charter is generally understood to mean a "charter of a boat in which the owner surrenders

21  *completely* the possession, command, and navigation of the boat." *Demise* (redirect from

22

        ————————————

23       [3] The parties do not address whether this policy is reasonably characterized as a contract of adhesion, and the Court declines to reach the issue because it has not been developed by the

24  parties.

"Bareboat Charter"), Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/demise#legalDictionary (emphasis added).  Here, the Navy retained elements of control over the MPC-4 and its crew (*see* Dkt. 21-1, at 4, 12–13, 20), so that it would be reasonable to conclude that the use of the MPC-4, if a charter, may not be a "bareboat charter" under the policy terms.  Similarly, although defendants argue that portions of the policy would be rendered superfluous by interpreting "charters" as including situations in which the assured had complete control of the vessel, such a circumstance did not occur here, where the Navy Contract did not fully relinquish control.  *See* Dkt. 43, at 19.

Accordingly, at this time, genuine issues of material fact preclude finding in defendants' or plaintiff's favor on the issue of whether the charterer endorsement covers the use of the MPC-4 by plaintiff, as this issue turns on a factual determination based on the intent of the parties.

### IV.  Coverage for Liability Assumed under Incidental Contracts

Based on the analysis above, the Court cannot grant either summary judgment motion because there are genuine factual issues related to the charterer endorsement.  The Court turns to whether at least some of plaintiff's claims—those related to the policy language about liability assumed under a contract—should be dismissed.

Plaintiff points to the primary policy's exclusion for liability plaintiff assumed under a contract other than an incidental contract, which exclusion implicitly *expands* coverage for liability assumed under incidental contracts.  *See* Dkt. 23-1, at 15.  There is no serious dispute that the Navy Contract is an "incidental contract" as defined by the primary policy.  Dkt. 41, at 23.  Thus plaintiff argues that the policy covers the damage to the MPC-4 because plaintiff assumed liability by promising the Navy to be liable for loss to Government property.  *See* Dkt. 28, at 21.

The Court agrees with defendants that the Navy Contract language does not result in coverage under the primary policy because an insured does not "assume" liability for damages the insured would already be obligated to pay.   Here, plaintiff was already inherently liable for damages arising from breach of its own contract.

As noted, the primary policy excludes "liability assumed by [plaintiff] under any contract or agreement except an incidental contract[.]"  Dkt. 23-1, at 13, 15, 39.  Although phrased as an exclusion, this language in fact appears to significantly broaden coverage because of the extensive definition of an incidental contract and because by implication, assumption of liability under an incidental contract *is* covered.  *See Olympic, Inc. v. Providence Wash. Ins. Co. of Alaska*, 648 P.2d 1008, 1010 (Alaska 1982) (discussing a similar exception).  Because the Navy contract incorporated a term rendering plaintiff "[l]iable to the Government for loss or damage to property, real and personal, owned by the Government or for which the Government is liable" (48 C.F.R. § 252.247-7007(a)(1)), plaintiff asserts that it "assumed liability" for damaging the MPC-4.

*Olympic, Inc. v. Providence Wash. Ins. Co. of Alaska*, 648 P.2d 1008, and subsequent case law applying *Olympic*'s holding resolve this issue.  In *Olympic*, similar to the primary policy here, coverage would exist if an insured had entered into an incidental contract in which the insured "assumed liability." *Id.* at 1010.  The insured was a tenant who had contracted to provide liability insurance on behalf of a landlord, but the tenant failed to do so. *See id.* at 1009–10.  The court held that "'[l]iability assumed by the insured under any contract' refers to liability incurred when one promises to indemnify or hold harmless another, *and does not refer to the liability that results from breach of contract*." *Id.* (internal citations omitted and emphasis added).  In the court's view, agreeing to provide liability insurance simply showed the intent to

1    transfer the cost of insurance to the tenant and not what was required for there to be an

2    assumption of contractual liability:  a "clear[] and unequivocal[]" "intention to shift liability."

3    *Id.* at 1011.

4        *Olympic* stands for the idea that contracting to be liable for the insured's own, existing

5    liabilities to the contracting party cannot be considered an "assumption" of liability under a

6    policy language such as that in the primary policy here.  For instance, in *Travelers Property*

7    *Casualty Co. of America v. Peaker Services, Inc.*, 306 Mich. App. 178, 187 (2014), a state court

8    applied *Olympic* and rejected an argument that an insured's assuming the insured's own liability

9    in a contract was an "assumption of liability" under an insurance policy.  "Assumed liability

10   differs from liability arising from an insured's breach of his or her own contract in that the

11   former connotes *the taking on of additional liabilities in excess of those imposed on the insured*

12   *under general law*."  *Id.* at 188 (emphasis added).[4]

13       Other cases have reached similar conclusions.  *See, e.g.*, *Am. Fam. Mut. Ins. Co. v. Am.*

14   *Girl, Inc.*, 268 Wis. 2d 16, 48 (2004) ("The term 'assumption' must be interpreted to add

15   something to the phrase 'assumption of liability in a contract or agreement.'  Reading the phrase

16   to apply to all liabilities sounding in contract renders the term 'assumption' superfluous.");

17   *Indiana Ins. Co. v. Kopetsky*, 11 N.E.3d 508, 524 (Ind. Ct. App. 2014), *opinion corrected on*

18   *reh'g*, 14 N.E.3d 850 (Ind. Ct. App. 2014) ("Today we join those jurisdictions who have held

19   that contractual liability exclusions in CGL policies bar coverage not for liability incurred by a

20

21

---

22   [4] The policy at issue in this case had an exception to the exclusion for damages assumed by
     liability in a contract, which exception applied to damages that "the insured would have in the
23   absence of the contract."  But the analysis that the Court relies on here pertains to the
     exclusionary language (and not the exception).  *See Travelers Prop. Cas. Co. of Am.*, 306 Mich.
24   App. at 187–88.

1  contract breach but, rather, for liability assumed from a third party, which seems to be the

2  majority position by a wide margin.").

3          Thus the Court does not agree with plaintiff that the language in the Navy Contract

4  stating that plaintiff would be liable for damage to Government property, in this circumstance,

5  amounted to an "assumption" of additional liability beyond that for breach of contract.  *See also*

6  46 C.J.S. Insurance § 1418 ("Under the provision of a liability insurance policy referring to such

7  coverage, in order for a contract to be covered as an incidental contract there must have been a

8  liability assumed by the insured, and the insurance policy must cover that assumed liability.

9  Such liability refers to that incurred when one promises to indemnify or hold harmless another,

10  or to tort liability assumed by contract, and *does not refer to liability that results from breach of*

11  *contract*."  (Footnotes omitted and emphasis added.)); *id.* at § 1419 (discussing exclusions for

12  assumption of liability and stating that the language applies only "where the insured would not

13  have been liable to the third party absent the insured's agreement to pay").

14          This reasoning is consistent with the plain meaning of "assuming" something since an

15  "assumption" means "[t]he act of taking (esp. someone else's debt or other obligation) for or on

16  oneself[.]"  *Assumption*, Black's Law Dictionary (11th ed. 2019).  It would render the word

17  "assumption" superfluous in the primary policy to conclude that plaintiff "assumed" liability by

18  agreeing to be liable for what plaintiff would already be obligated to pay—damages to

19  Government property used while performing the Navy Contract.  *See also King Cty. v. Travelers*

20  *Ins. Co.*, No. C94-1751Z, 1996 WL 257135, at *4 (W.D. Wash. Feb. 20, 1996) (citing *Olympic*

21  and other authorities and explaining that exclusions related to assumptions of liability "do not

22  exclude liability based on simple breach of contract.").  Thus, the Court does not agree with

23

24

1  plaintiff's argument that because plaintiff promised to be liable for damages to Government

2  property, plaintiff "assumed liability" within the meaning of the primary policy's language.

3       Plaintiff cites to a number of cases from jurisdictions other than Alaska.  *See* Dkt. 47, at

4  10.  However, these cases do not involve interpreting policy language requiring the "assumption"

5  of liability and are not useful here.  *See Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025, 1032

6  (9th Cir. 1992); *Yang Ming Marine Transp. Corp. v. Okamoto Freighters Ltd.*, 259 F.3d 1086,

7  1092 (9th Cir. 2001); *Erickson Paving Co. v. Yardley Drilling Co.*, 7 Wn. App. 681, 685 (1972).

8  Nor is the Court persuaded by plaintiff's citation of a law review article summarizing different

9  approaches to policy coverage for an insured's agreement to indemnify another for tort liability.

10  *See* Dkt. 47, at 10 n.24.

11       Therefore, the Court agrees with defendants that, as a matter of law, the assumption of

12  liability language in the policy was not triggered because plaintiff did not "assume" additional

13  liability when it agreed to be liable for damage to the Navy property under the Navy contract.

14  To the extent that plaintiff rests its claims on allegations of coverage under the primary policy's

15  "liability assumed by the assured under any contract or agreement except an incidental

16  contract. . . ." language, such claims should be dismissed.

17                                    **CONCLUSION**

18       For the reasons set forth above, the Court recommends denying plaintiff's partial

19  summary judgment motion (Dkt. 28) and granting in part and denying in part defendants' partial

20  summary judgment motion (Dkt. 41).  To the extent that plaintiff rests its claims on allegations

21  of coverage under the primary policy's "liability assumed by the assured under any contract or

22  agreement except an incidental contract. . . ." language, such claims should be dismissed.

23

24

REPORT AND RECOMMENDATION - 20

1    Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

2    fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P.

3    6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

4    review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those

5    objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v.*

6    *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

7    imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **May 6, 2022,**

8    as noted in the caption.

9    Dated this 15th day of April, 2022.

10

11

12    J. Richard Creatura
      Chief United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

24